THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* MARCELINO RIVERA, Defendant and Appellant.

No. 5737. Argued December 4, 1935.—Decided February 21, 1936.

*Arturo Aponte, Faustino R. Aponte,* and *R. García Cintrón* for appellant. *R. A. Gómez, Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Marcelino Rivera was charged before the District Court of San Juan, by its prosecuting attorney, with the crime of

murder, committed on the person of Domingo Bonano, in Río Grande, on May 24, 1933.

He pleaded not guilty and asked for a jury trial. The trial was held on November 24, 1933, and the jury returned a verdict of guilty of manslaughter. He filed a motion for a new trial which was denied, and the court sentenced him to three years' imprisonment in the penitentiary. He took an appeal to this court and in his brief he maintains that the trial court erred in refusing to set aside the verdict, in denying a new trial, and in refusing to admit in evidence a certificate to the effect that the deceased had been sentenced to three years' imprisonment in the penitentiary for an offense of assault with intent to rape.

We have examined the evidence introduced by both parties. The evidence for the prosecution tends to prove that the defendant, Marcelino Rivera, overseer of a cane plantation (*colonia*) called "Blasina," had engaged the deceased, Domingo Bonano, to weed a cane field; that on the morning of the 24th of May 1933, the defandant went to the cane field and the deceased asked him for a cash advance and the defendant answered that there was no money; that the deceased said to his helpers, "If there is no advance, we will quit; let's go, boys"; that the defendant said, "Don't go, we will fix that matter later on," to which the deceased replied: "If it is going to be fixed, give me an advance to get some lunch for my men in the store," and the defendant then said, "Come with me, I'll get the money down there," and he went away on his horse, followed by the deceased.

Nothing further was witnessed by the laborers engaged in the weeding, who were called to testify for the prosecution. Nicolasa Millán, and Eusebia Aquino, who were washing clothes in a brook, testified that shortly thereafter they heard a shot and almost immediately the defendant passed by on horseback and said "Go over there, I have shot a man; and see whether he is dead or alive." The women went there

and they both say that they found Bonano alive and that ''Just as we got there he died.''

How did the fight occur? The evidence introduced by the prosecution consisted in the testimony of María Rodríguez. She stated that from her house she saw the defendant on horseback and heard him give some orders to certain laborers who were working for him, ''and that then Domingo Bonano came to where Marcelino Rivera was, and said: 'Did you call for me?' . . . Marcelino was writing thus . . . Bonano talked while holding a small package in his right hand . . . while he talked he shook his left hand like this, towards the defendant, and then Marcelino dismounted and he and Domingo went on talking. I saw him standing like this, and Domingo talked to him; suddenly he raised his voice, did like this, and then he shot him.''

The first witness who testified for the defendant was Juan Morales. He stated that María Rodríguez had told him that she heard a shot but that she saw nothing.

Eduvigis Marrero was the next witness. He testified that he was wórking on the same side as Bonano. The defendant came, inspected the work done by Bonano and as he found some weeds unremoved, ordered him to go over his work again but he refused, and then Marcelino said that his name would not be entered in the payroll, and left. Bonano asked his son for a file and dismissed the workers, and after saying to the witness ''I am going over there to get a couple of drinks, and wherever I meet him we are going to have it out,'' he went away.

Carlos Luis Marrero testified that he heard Bonano shouting: ''Don Marcelo, stop right there!'' Marcelo stopped and when Bonano came near, he grabbed him by the shirt and mussed it up. He dismounted by the opposite side and Bonano went at him quickly, and ''Right at that moment I heard a shot and saw Domingo Bonano turn and fall down and I arrived and he was lying on his face, and Mr. Marcelino Ri-

vera was taking away a file that he had under his hand." The defendant "got on his horse and rode off."

The defendant himself took the stand. He testified that from seven to eight o'clock in the morning he had been examining the weeding work let out to Bonano and finding it unsatisfactory, he ordered the deceased to do it properly, and as he refused, he told him that he would not enter his name in the payroll. He left and while on his way to lunch, at about ten or eleven o'clock, Bonano called him, but he paid no attention and went on. Afterwards, "he turned his horse around in order to face Bonano as the latter said, 'Aren't you going to pay any attention to me, Don Marcelo?' " Upon coming near him, Bonano said, "This morning you told me that you were not going to pay me for my work, and right here you are going to settle it with me as man to man . . ." and he attacked him. The witness moved to the left and Bonano turned to that side and drew a file which he carried underneath his belt; the witness fell back and fired a shot at him. The witness had known Domingo Bonano for about three or four years.

The following incident occurred, according to the statement of the case:

"Thereupon the district attorney requested that the jury withdraw in order that he might raise a question; the court granted the request and the jury left the court room. . . .

" 'Your Honor, the only question I wish to raise is this: Domingo Bonano has served a term of three years in the penitentiary for an offense of assault with intent to rape. We think that such a fact is irrelevant and immaterial in the matter under investigation. The defendant may introduce evidence to show that Domingo Bonano was the most quarrelsome and blood thirsty person that might be imagined, as he has already laid the foundation therefor. But a conviction for an assault with intent to rape can not at all be introduced in evidence.'

"The defendant, through his attorney argued as follows:

" 'We wish to show that the defendant was in imminent danger when he faced the deceased, and that as the reputation of the

deceased was notorious in the community where he lived, as a person of a turbulent, quarrelsome, violent, aggressive, and dangerous character, and as the defendant, moreover, was aware of such reputation, and as he was so dangerously placed when he was assaulted by this individual, we offer this evidence for the purpose of establishing the state of mind of the defendant, as it is not the same thing for a man to face another good and peaceful man than to face a dangerous person who has also assaulted women, since rape is nothing more than an assault and may be punished as such. The same degree of caution and prudence can not be required of a citizen when he encounters a decent member of the community than when he faces an ex-convict, sentenced on a charge of assault with intent to rape. Besides, an assault with intent to rape, or any assault on a woman including the kissing of her, logically implies the thought that the perpetrator of such an act is liable to be attacked by the relatives of the victim and therefore it is indicative of the fact that the man is quarrelsome and aggressive, ready to face the consequences of an act of this kind. Accordingly, we offer in evidence a certificate of the Warden of the Penitentiary of Puerto Rico showing that the deceased had served a term of three years in the penitentiary, from 1922, to 1925, for the crime of assault with intent to commit rape.'

''The court sustained the objection of the district attorney and refused to admit the certificate; whereupon the defendant took an exception.

''The jury returned to the court room and the witness continued to testify on direct examination as follows:

''That he knew the reputation that Domingo Bonano had in the community; that he was not reputed to be a peaceful man; he was known as a daring and quarrelsome man. That he specifically knew of certain acts committed by Bonano which show that he was a quarrelsome and mean person. That on one occasion Bonano had struck a son of his with a machete, for which he served a term of six months in jail; that he also beat his wife and was convicted of assault and battery for that offense, and served a month in jail; that in addition he had been convicted of a breach of the peace, of quarreling, etc. That on the day of the occurrence, when the witness had that quarrel with Bonano he knew that such was his reputation and character in the community: he was a dangerous man.''

In his argument under the first assignment of error, the appellant in his brief maintains that the evidence on both sides was not conflicting and that a proper weighing thereof

as a whole must show that the defendant acted in self-defense. We think that the evidence is conflicting, and that the evidence for the prosecution supports the verdict rendered. The jury believed the testimony of María Rodríguez, and based thereon it could, as it did, find the defendant guilty of manslaughter, disregarding his plea of self-defense.

In arguing the other error assigned by him, the defendant cites generally several cases and adds:

"Let it not be argued that a conviction of assault with intent to rape fails to throw light upon the quarrelsome and mean character of the deceased. The crime of rape or assault with intent to rape necessarily implies force or violence; in other words, the crime of assault and battery is included in that of rape. It was so held by this Hon. Court in the case of *People* v. *Arroyo*, 38 P.R.R. 473, 476, where it said:

" 'Section 286 of the Code of Criminal Procedure reads as follows: "The jury may find the defendant guilty of any offense the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." And the fact is that the crime of rape by force or violence, and perhaps in any other form, includes that of assault and battery.'

"In harmony with the doctrine upheld by the American courts and by all text writers on criminal law, this Supreme Court has held that it is reversible error to strike out that part of the testimony of the defendant referring to specific acts of the deceased, said court expressing itself thus:

" 'Where a defendant testifies without objection by the prosecution to specific acts of the deceased to explain the grounds for his belief that he was exposed to serious bodily injury when attacked, the subsequent striking out from the record of that testimony is reversible error.' (*People* v. *Pérez*, 36 P.R.R. 642.)

"And let it not be said that the fact that the defendant was allowed to testify regarding other specific acts of the deceased operate to cure the alleged error.

" 'An error in excluding evidence as to the general reputation of the deceased as to resorting to the use of firearms when engaged in quarrels is not cured by the fact that ample testimony as to his reputation as an aggressive and dangerous man has been introduced.' (Wharton on Homicide, (3rd ed.), p. 436.)

612

"This action of the lower court gravely prejudiced the rights of the defendant, because if this evidence regarding the sentence served by the deceased in the penitentiary had reached the jury, the verdict rendered would certainly have been different, since as a general rule a person convicted of a misdemeanor, irrespective of the kind of offense, does not produce in the mind of a reasonably prudent man the same sense of fear than a person who has served several years in prison does."

Underhill, in his Treaty on Criminal Evidence, 1935 ed., p. 1110, par. 562, says:

"Evidence of the quiet, peaceable disposition, or sober and industrious habits of the deceased, or of his general reputation as a good man or worthy citizen cannot be proved in advance. Such evidence is admissible only to rebut evidence adduced by the accused, attacking the deceased, or to rebut evidence introduced by accused showing threats by deceased against accused, if the threats were claimed to have been made before the conflict began. Evidence of the bad character of deceased, which is irrelevant to the issue, may not be shown by the defendant. The rule is also well settled that evidence of the reputation of the deceased for turbulence, recklessness or violence is inadmissible, unless the circumstances of the case at least raise a doubt whether the prisoner acted in self-defense. A murderer is not excusable merely because the person murdered was a bad man. But when the evidence tends to show, in the slightest degree, that the killing was in self-defense, or shows a hostile demonstration by the deceased against the accused at the time of the killing, or even leaves it in doubt who was the aggressor, it is always relevant to show that the deceased was a quarrelsome, desperate and revengeful man, provided it also appears that his reputation as such was known to the defendant. In a case where the accused alleges that the killing was in self-defense, he may prove that the deceased was in the habit of carrying a pistol or other concealed weapon. But as a preliminary to such evidence, the accused must show some justification, and must also show that he had knowledge of the habit of the deceased in carrying weapons.

"In some states, the threats of the deceased or his dangerous, violent or vindictive character are only admissible when it is proved that, at the time of the homicide, he assaulted the accused, indulged in hostile demonstrations against him, or did some act indicating a purpose to do him serious bodily harm. . . .

". . . . . The majority of the cases reject evidence to prove the actual moral character or disposition of the deceased, i. e., his inclination to do right, but admit his reputation in evidence, that is, the general opinion of his character and disposition which prevails among his neighbors and acquaintances. The reputation of the deceased for vindictiveness or quarrelsomeness can not be shown by proving specific acts of violence to third persons, unless so connected with the fatal encounter as to produce a reasonable apprehension of grievous bodily harm, as, for example, that he was an escaped convict, or that he had threatened to shoot or kill a third person. . . . . Reputation of deceased for chastity is ordinarily inadmissible. Evidence of character of deceased must, of course, be of the reputation of the deceased, in the particular trait involved, and not of specific acts or actual character. . . . It is his character for peace and quietude or the contrary at the time of the homicide which is in issue, and with respect to which the test of relevancy must be applied."

It is true that an assault with intent to commit rape involves an assault; but it is an assault upon a female to have carnal intercourse with her. The criminal impulse in such case is different from the impulse which leads a quarrelsome man to assault, to injure, to kill his fellow creatures, and turns him into a dangerous individual against whom a person who encounters him, knowing his disposition, would be justified in taking the necessary precautions to defend himself.

That being so, and the defendant having been allowed to testify fully regarding the reputation of the deceased in the community and the specific acts committed by him of which the witness had knowledge and which tended to show the quarrelsome character of the deceased, it can not be concluded that the attitude assumed by the court was erroneous.

Even if the evidence for the prosecution were considered, taking into account the quarrelsome character of the deceased, it could not be concluded that the defendant was justified in killing the deceased. It might explain the sentence of three years in the penitentiary imposed by the trial court on the defendant when he could have been sentenced to ten

years, but it would not be a proper ground for this court to reverse the judgment and discharge the defendant.

The judgment and order appealed from must be affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.